Good morning, Your Honors, and may it please the Court, my name is Peter Bitt, I'm the Attorney at Law for the District of Columbia, and I'm here today to speak on the case of Jeffrey Treina. Dr. Treina could not be here today, he's out of the country on a family matter, but appreciates your consideration of this important case. The case comes before you as a result of a dismissal with prejudice, and Dr. Treina's verified and amended complaint from the Court below. It's our position that dismissal was an error, and the Court should reverse the demand of this case to the trial court for further proceedings. The case arises from defendants' actions in restricting and taking certain actions against Dr. Treina through a flawed and unfair process in the hospital's procedures, a failure by the hospital and the people involved in the proceedings to comply with the bylaws of the hospital, and based on that, taking action against him and reporting him to the National Practitioner Data Bank. This case is about fairness of process and the hospital following its rules that it set down. There are three major issues that we have with the Court's opinion below. First, the Court, if it dismissed the case on 2615 grounds, which is unclear from its order, the Court ignored the well-pled allegations of the complaint that alleged that the hearing panel was comprised of people that had actively participated in formulating the recommendations or actions at issue or in initiating or investigating the underlying matter at issue at any earlier stage of the proceedings. That's what the bylaws say cannot be on the panel, yet three members of the five-member panel had qualified for that restriction. Now, if the Court considered the affidavits submitted by the defendants, then it's a 2619 dismissal, but that wasn't proper either because the affidavits merely contradicted the well-pled allegations of the complaint. They simply said at bottom, we weren't actively participating, and they had one affidavit that simply gave a legal conclusion as to the interpretation of the bylaws. That's insufficient under Illinois law to satisfy the standards of granting a 2619 motion. And finally, the Court erred in dismissing the other counts of the complaint, which alleged lack of fundamental fairness in the process, to Dr. Treanor. I'd like to go into each of those issues, and obviously if the Court has questions, I'd be welcome to take them. In count one of the verified amended complaint, Dr. Treanor alleged the defendants failed to file their bylaws by having three physicians on the panel that were not allowed to be. The bylaws state, a hearing committee shall have no members who have actively participated in formulating the adverse recommendation or action at occasion of the hearing, or in initiating or investigating the underlying matter at issue at any earlier stage of the proceedings. There are two adverse recommendations at issue in this case, in this hearing below. The first resulted from a study done by the Department of Orthopedics, and the result of that was a request that Dr. Treanor give up or restrict certain privileges voluntarily or do a fellowship. He received a letter that said, this is an adverse action and tells you to hearing rights under the bylaws. He took advantage of that. One of the members of the hearing panel, Dr. Smith, was involved in those Department of Orthopedics meetings where that study was discussed, where the outliers of that study were discussed, where potential remediations were discussed. The second adverse recommendation at issue is a decision by the credentialing committee. The credentialing committee consisted of two hearing panel members, Dr. Shepard Smith and Dr. Curtis. The credentialing committee recommended approval of Dr. Treanor's privileges, save for two, pending the outcome of the adverse recommendation from before. That was sent to him, and this is another adverse action recommendation, and he had hearing rights and took advantage of those. Indeed, the board's decision, which is in the appendix, which is the highest level appeal of the hospital, recognizes there are two adverse recommendations at issue. The verified amended complaint alleged these two actions. It alleged that doctors on the hearing committee participated, actively participated, in initiating or investigating the underlying matter at issue at an earlier stage of the proceedings. It does not require a formal process to have started. It does not require that they actually vote on an adverse recommendation. It does not require that they be the ones issuing the adverse recommendation. The bylaws certainly could say that. They don't. So the question is, what is participation? It's active participation in initiating or investigating the underlying matter at any earlier stage of the proceedings. It's our position that if they participated in looking at the issues that caused the adverse recommendation, if they were involved in studying them, if they were involved in discussing Dr. Trena's application for credentialing and formulating what was going to happen, they investigated the matter, or even if they were involved in the initial study, for example, the Department of Orthopedics, they were involved, actively involved, in initiating the matter. It's not simply the formal process. So if the bylaws wanted to say only people who vote, for example, it could have. It doesn't. It's much, much broader. And for good reason. They want to avoid any question that someone has sort of, you know, gone into this and now is on the hearing panel affirming their own previous involvement, essentially. And so active participation, from our point of view, is if you are in that line of events and you get involved in investigating it, with the study, or discussing the credentialing application, or if you get involved by proposing or discussing remediation plans that are eventually adopted, then you have actively participated in that process. There are a number of doctors who can serve on these panels. For the hospital to choose three that had participated earlier, in an earlier stage of the proceeding, an earlier stage of the investigation, to put on that panel is against the bylaws. We further allege that, let me go back, with respect to their active participation, the minutes which are alleged show that Dr. Smith was present at a number of the Department of Orthopedics meetings where the study which led to the first adverse recommendation was discussed and talked about. And what was to be done. Was this a study of the department and the members of the department? It was a study by the department. Initially it was a general study of the department for certain surgery rates. And they identified two alleged or potential outliers on certain metrics. Then your position is that no one in the department whose performance was studied in presumably an objective empirical method could sit on the committee in judgment of or decision-making capacity of anyone in that department? No, let me clarify, because I want to make sure it's clear. It's not if they were studied by the study, it's if they participated in discussing the study and potential remediation for the alleged outliers. So if people weren't at the committee meetings, if there were orthopedics who were not involved in those meetings, who were not discussing the study, who were not discussing those things and involved in that process, they could certainly serve on the panel. Simply because the physician was studied doesn't eliminate them. It's the involvement in the investigation. It's the involvement in the, gee, we've got this study, here's what it shows, what do we do, sort of discussions that are out there. And what we have are minutes that show that Dr. Smith was at these meetings where the study and these outliers were discussed. Similarly with the credentialing committee meeting, it's not that doctors put up for credentialing, it's that the committee members, people who are deciding what to do with people's requests for credentialing, they have to recredential on a regular basis. Those people who are discussing that and deciding and formulating what they're going to do, and what actions should be taken in making a recommendation, what actions should be taken on these applications, are disqualified. So it's not that they were studied, it's that they were involved in the investigation that led to the adverse action. If you trace it back, the adverse action was taken, what led to it? You look at that path from beginning to end. Not from the formal process, which is what the defendants stress. They will say, well, no formal process had begun. But that's not the test. The test is any earlier stage of the proceedings. The bylaws do not say formal process needed to begin. And by formal process, you're talking in terms of a formal complaint? No. What they refer to as the formal process is the hospital's formal adverse recommendation process. There's a point in the bylaws where they consider a formal process to have begun. And it's a good point you bring up because it leads to another issue that's sort of subtle. They say the formal process began for the first adverse recommendation. At this time, there's an ad hoc committee formed. And before that, there was no formal process. You shouldn't consider the department meetings. But the problem with that is, before that, they sent a letter to Dr. Trena indicating what the department had decided to do and made him an offer that he could do one or two. He had two choices. But either way, he was going to get reported to the data bank. And that's important not because of a report. Of course, that's important. But what that means is the only reason that decision would have been reportable is if the formal process had already begun. So the hospital is telling you today, or in their briefs, that the ad hoc committee, which was after this letter, was the start of the formal process. You're saying that a letter went to your client before that. Yes. And that it evidenced a judgment. It had evidenced a decision by the department which the hospital's stress was reportable. And under the rules of reporting of the practitioner data bank, that decision was only reportable if the formal process had already begun. Well, what you're saying is that letter evidences prejudice, right? It may have evidenced prejudice, and that's one point. Not prejudice, pre-judgment. Pre-judgment to some extent. Before the ad hoc committee. Yes. The path of the letter, there's the study by the department resulting in this letter that says he's going to be reported to the data bank. He requests the process be the sort of other remedies under bylaws, the first of which is an ad hoc committee. That's formed. They make a recommendation, which is the adverse recommendation. Defendants argued below that the earlier study by the department, one reason it shouldn't matter is because it wasn't part of the formal process. We say, first, that doesn't matter. It doesn't matter if it's formal or informal. It's part of the chain that leads to the adverse recommendation in the investigation. But as a second point, if it matters when the formal process began, then it's not the ad hoc committee that began the formal process. By defendants' own admission, by sending that letter, the formal process had begun with the department study and decision. Because the only reason the letter, and it's in evidence, it was attached to the complaint, the only reason that letter gets sent and say you're going to be reported is if they consider the formal process had begun. So if they're going to argue that the formal process is required, and you agree with that, I would submit that the formal process began with the department study and discussion which led to the letter prior to the ad hoc committee, which would still put Dr. Smith into the category of excluded members. Thank you. But in essence, your claim is under the reading of 15.8 of the bylaws, isn't it? Yes. And you suggest that 1508 is pretty broad and prohibits anybody who investigated or initiated or actively participated in formulating adverse recommendations would be barred, correct? Yes, just the way it reads, Your Honor. I'm not trying to change the words. I'm not suggesting you were, but that's the essence of your claim on count one, isn't it? That the people who were involved in the hearing were not allowed to be because they actively participated, and I would focus on the second clause, in initiating or investigating the underlying matter at issue at any earlier stage of the proceedings. And their claim, if I understand it, is that they weren't part of the credentialing committee meeting and so forth, but the claim is that earlier on they were involved in the early investigation, correct? For one of them. Dr. Smith, who's in the Department of Orthopedics, may help to separate. The first adverse recommendation goes back to the Department of Orthopedics. Dr. Smith was at the meetings of the Department of Orthopedics where this study is discussed, which leads to this letter, which leads to the AHOP committee and the adverse recommendation. And Curtison, was it Skelton? Sheckleton. What is it? Sheckleton. Sheckleton. Sheckleton, they didn't vote, or they were absent from the credentialing committee, right? They were at credentialing committee meetings where Dr. Trainor's application was discussed. The meeting they missed, which the defendants referred to, was a vote, a vote of whether this is what we're going to adopt and recommend. And the bylaws do not require that they be present for the vote. That would be sort of in the formulator. They weren't there when the vote was taken to decline the renewal, though. It said hip and knee replacement procedures. They were not present for the actual vote by the meeting,  their decisions were formulated and they considered the issue and I would say investigated the issue of what they would do. Now going back to the bylaws, the bylaws refer to formulation or formulating. And are there more detailed definitions of formulation? I mean, it's broad language, isn't it? In the bylaws, you mean? No, there's not. So this language is there involved in formulating. That's the first clause, right? In formulating the advantage of recognition or the second clause, in initiating or investigating the matter issued at any earlier stage. Are there transcripts of these proceedings, the proceedings where the study was discussed but before the February 18th letter went out? Oh, you mean the department meetings, for example? All we received from defendants during the underlying, I mean, at the hospital level proceedings were the minutes. So they're saying Smith was present at the meeting but there's no demonstration that he participated by speaking. With Smith, it's unclear what they're saying. He was at the meetings. We don't have discovery enforcement to be able to ask what was said. They don't keep a transcript as far as I know. And then the same theory applies to the second adverse recommendation that these physicians were present but they weren't there when the vote was taken. So therefore, it's not active participation. That's their theory. We strongly disagree that you don't have to just be there for the vote. If they said vote, they would say that. So your theory is active participation includes being present where the issues are discussed. Being present at a meeting where they're discussed, which presumes if you're on the committee actively participating, which you should be if you're there. Much like if we sat in a trial court and listened to evidence without ruling in the trial court in the case that came before us, there's a taint that Rule 15.8 is designed to avoid by listening. Right. Even by listening, you are taking in evidence in one form, and your example is perfectly appropriate. If you were to listen at the trial court and take in evidence that way. Without ruling. Without ruling. Or speaking. Right. And then come here and decide the case based on whatever is before you, which may or may not include what you heard, or may or may not include your thought process down there. I would trust that the judges here would obviously do their duty, but there would be a question certainly raised by that taint. The difference in my example is, and perhaps I'm wrong, Dr. Trena was not present during those committee meetings. He is not on the committee. He was discussed. Correct. He is not on the committee. So it's kind of like an ex parte. To some extent. Yeah. Well, you allege that the three doctors were present at these earlier meetings where the course of future conduct and the actions to be taken were discussed. We believe so, yes. That was pled. That was pled, yes. With regard to the other counts, the Atkins case is pretty suggestive that you really, unless you have a fundamental, if you were fundamentally deprived of due process, it's not the same kind of hearing like court hearings and things like that. Isn't that right? The Atkins case does say that you don't get a court hearing. There's not. There actually was a judge who was a hearing officer, but you don't get the rules of evidence. You don't get the rules of civil procedure. That's correct. But what Atkins says, and what actually Head says as well, is that there are certain guarantees of fundamental fairness. And Atkins, first, it gets past the bylaw point by saying the hospital filed the bylaws, and then it gets into the whole idea you must show prejudice and things like that. We've alleged in the complaint a lack of this fundamental fairness from the people involved in the process, had an ax to grind with Dr. Trena. I mean, the allegations of possible bias. Yes. Dr. Trena had a split with a former orthopedic partner that he worked with. That partner is the head of the Department of Orthopedics and on the Medical Executive Committee. He's also the chief witness against Dr. Trena at the hearing. There was another similarly situated physician in the study. He was treated differently than Dr. Trena. Absolutely. Thank you. Do you have to allege bias? Isn't it just the potential? Under Atkins, what they argue is that in order to succeed, and Atkins is a summary judgment case, so they had discovery. I would submit that you are correct. We would have to allege facts that would support the finding of bias, obviously pending discovery. We don't have to plead evidence, and indeed in this case we couldn't, because we haven't had the opportunity to depose Dr. Kirst, Dr. Shackleton, Dr. Smith, Dr. Atkinson, all those people, and there's a reason why. We're at the pleading stage, and we have pled facts that if assumed to be true, and this is where the trial court erred, we believe. They did not take these allegations as true. If you assume them to be true, it must be done on a 2-6-1-5 motion, then there is a showing of, even under Atkins, that bias element that existed in the panel in the proceedings. But as far as the panel point, the count one point, it's our submission that if the hospital didn't follow its bylaws, which are sort of like a contract with the doctors, we don't get to the prejudice point. You need to follow the bylaws first. You've answered my question. Thank you. Any other questions? If I may just have 10 seconds, thank you for your consideration, and we again request that the court reverse and remain. Thank you. Counsel, you may approach. Thank you. You're welcome. Thank you. Good morning, Justices. May it please the court, counsel. My name is Christopher Ilnawida. I represent OSF Health Care System and the other defendants that were named in this case. Really, this appeal is from two separate decisions made by two separate trial judges on this case, both of them dealing tangentially with and directly with fundamental fairness, the other dealing with the bylaws question. Both, at least the first justice, came to the conclusion that fundamental fairness was, in fact, found, that there was fundamental fairness, and dismissed the case. However, at the conclusion of his discussion on his order, he said, well, you can go ahead and refile on the basis of the bylaws, and that is what counsel did. The second justice, the separate justice, reviewed this whole case. Pardon me? The second. The second judge took a look at this case, separate judge lines. He also looked at the whole case, and with respect to the bylaws in particular, he found that the bylaws had been complied with. And so, in the process, he also said, with respect to count one, which had actually been thrown out before and repled, that also should be dismissed. Is that the fundamental fairness count? Yes, sir. Oh, no, sir. The count one's the bylaws. Well, the thing, Judge, it tends to get a little bit confusing, because when fundamental fairness is talked about in part, it deals with complying with bylaws and doing what's necessary to afford all the protections that the doctor training has allowed. From my reading of it, count one was an action that talked about fundamental fairness, but it also talked about declaratory relief. So... It talks about bylaws, doesn't it? It does talk about bylaws, and in part, that's what Judge Schor had found, the first judge. He had said, in my perspective, looking at everything that's been done, there was fundamental fairness in this particular case. Well, is that the question? Or is the question whether they follow the bylaws? Well, that's what, you know, if you read his... I thought there were two issues here. There are. There are two issues. And if you read his discussion and his, you know, his rulings, toward the end of his rulings on the first case, he said, well, I find fundamental fairness has been found, but I'm going to have you, if you want to, replead on the subject of bylaws. So... Can I back up for a second? Because we're reviewing this de novo. Correct. We're looking at these counts, de novo. And it's unclear to me if they're really 615 or 619 motions, but let's look at first count one. Okay. Count one's the one dealing with the bylaws. With respect to count... Well, Your Honor, with respect, there is an amended complaint file. That's what we're looking at. It's the last amended complaint. I'm just referencing an original complaint that was originally filed. With respect to the second one, there was talk about bylaws. I mean, I guess maybe what I'm looking at is two cases, two filings, an original complaint, and then an amended complaint file. I guess what I'm looking at is the amended complaint that was filed. Do you agree it's de novo review? Pardon me? Do you agree that it's de novo review? It is certainly de novo. Then all we're looking at is the record. We don't care what the judge has said. With respect to the issue that was raised and has been talked about here in terms of the bylaws, it is 15.8. And that is the focus of this particular matter. We're talking about a reference to... two of the hearing members, the hearing panel by the name of Sheckleton and Curtis, Dr. Sheckleton and Curtis. These particular physicians were members of the credentialing committee. The credentialing committees, the sole reason for its existence is to recommend to the further body whether people should be recommended for privileging or not. That's what they do. They're not in the process of the corrective action that is part of the bylaws. In fact, the credentialing committee, consisting of Sheckleton and Curtis in part, they were acting on what Dr. Trena had wanted. He was reapplying for privileges. In the process of this whole going with a corrective action and adverse recommendations, what counsel and Dr. Trena would like to do is to suggest to this court that the credentialing committee had a direct relationship to the corrective action and the adverse recommendation. It didn't. It was in the process of reapplying. He needed to reapply just to keep practicing. Let me ask this question, because in the bylaws there is very broad language regarding participation, and the word is formulation, right? Formulation. And there's an allegation in the complaint that the three doctors were present at department or committee meetings when the underlying conduct was discussed and decisions were made regarding the course of action to be taken or recommendations to be made as to the plaintiff's medical privileges. That's the allegation in the counts. And when we're reviewing this de novo and we look, either it's a 615 or a 619 motion, then it is, is that allegation, does that fit formulating? No, in fact, just as Holder mentioned this earlier, the question is, what is the adverse recommendation or action? And our position is very clearly that the adverse recommendation or action is something that's in the process of the bylaws. It starts with the ad hoc committee who investigates, who is asked to investigate, goes then to the MEC, the executive committee. Nobody that we're talking about here, Shackleton, Curtis, or Smith, were involved on the executive committee that determined to proceed with this. Who decides to go to the first step? Generally, the MEC, the medical executive committee, says we're at this point, ad hoc committee, take a look at this and investigate. And the allegation is that they were part of these other committee meetings. Isn't that right? Yes, absolutely, sir. And I like to address that because that's really the crux of the whole thing. They're saying, well, because they were on the credentialing committee, they had some knowledge of what was going on, and therefore they were in some way prejudiced and in violation of 15.8. Not only were they not present for this ruling, but the fact is... The final decision they weren't present. Absolutely. They were present at two earlier meetings, but there was no decision making. But probably the more important issue, and it goes back to Judge Holdridge, the question is, when does this whole process start? By the time it got to the credentialing committee, it was already in the process. In other words, the ad hoc committee had already proceeded through. We had gone through with the EC, the executive committee, and when the vote was actually taken, neither of them were there. But what I'm trying to say here is, and I think Adkins talks about it, knowledge of any particular event, and this goes back to some earlier questions, knowledge of earlier events and the cases doesn't necessarily mean that they cannot then participate. Because if that's the case, everybody would be... There you're talking about the fundamental fairness aspect. Yeah, exactly. Let me concentrate on the 15.8. Doesn't that prohibit anyone who initiated investigation into the underlying conduct or who actively participated in formulating the adverse recommendation? And that's exactly the rub, Judge Carter. Isn't that 15.08? Yeah, 15.8. The question is, when does this proceeding start? And it's our position, and let's go back to something that's a little bit earlier, and I want to touch on this to make sure that I can say something about it. This business about Dr. Smith and the original quality assurance review, when this was back three years before, when the entire department was being reviewed, the entire department, and looking at all these statistics, he was present when they were doing that. This was long before all of this began, long before the corrective action was suggested or the adverse recommendation. And at that time, all they're doing is looking at statistics. Dr. Trena would like to suggest to you that while that starts the process and that amounts to initiating or investigating underlying matter at issue, we would submit to this court that that particular phrase refers to when the ad hoc committee is directed to investigate. Let's parse out what the underlying issue is. Maybe that would help clarify this. We have a study, an empirical study, which even Dr. Trena apparently has given the results of and the department discusses it, perhaps. I don't know. He won't. Okay. And so those are the results, and then we'll show different positions and different points of return, follow-ups, whatever it is in their profession. What is the underlying issue that actually is being investigated and acted upon? At that particular point? Yes. At that particular point, they were looking at all of the potential knee replacements between 01 and 04, all of the orthopedic surgeons and their rates of revisions, every one of them. And that was part of their quality assurance program. OSF wants to maintain the highest standard of care for their patients. So this was a study that was done. Out of that study, there were two physicians. One of them was Dr. Trena. Two physicians were found to be what we call outliers. In this case, Dr. Trena was more than two to three times likely to have revisions on knee replacements than all the other orthopedic surgeons with the exception of one. There were two people. And so at that point... And the comparison group is internal to the department, or is it? It was. A comparison group to what's called best practices or some standard in the United States in the orthopedic department. And actually, the point is well taken. Actually, in terms of national statistics, Dr. Trena was almost five times more likely to have revisions than the national average for orthopedic surgeons, two to three times with the locals. So at that particular point, they're looking at these statistics, and that's when there was a letter sent to Dr. Trena saying, You are an outlier. This is the results. This is some of the things that you can do. One of the things that's not mentioned, I don't know why, is that he was given an opportunity for remediation within the department to work with other surgeons to improve the problem that he had. He chose not to do that. It was his right. He was also given the other two opportunities. He was given a hearing. He was given all the rights afforded in a hearing. He was given the opportunity to have counsel. He was present. He was able to cross-examine. He was able to put himself up on the stand. He had a witness. All of this was proceeded with under the bylaws and isn't being complained about. What we're talking about here is the issue about the initial quality assurance during those four different meetings when they were looking at statistics of everybody. That's when they keyed in on the two doctors. Yes, sir. Was that called an investigation under the bylaws? No. No. Was it defined someplace in the bylaws? We don't consider that. No, you don't consider it, but does the bylaws say anything about that? It doesn't. It just says investigation. It says investigation 15.9. Judge, you're on. You did say that it wasn't being complained about, but Dr. Trena did object to those three physicians being named to the committee before the hearing, if I understand the record correctly. Oh, no. No, in fact, you're right, Justice. Absolutely they were complaining about both of them in particular, the two credential people. Yes. No, absolutely. Then why not just put somebody else on the committee? Is there a shortage of physicians? I can't speak to the reasoning, but I think part of it dealt in part with the fact that the credentialing committee, again, is not part of the corrective action process under the bylaws. And number two, they weren't even present at the time. And number three, this particular ruling or this particular recommendation from the credentialing committee simply continued the status quo. Dr. Trena asked for his core privileges, which he was allowed.  And that's what he had requested several months before. That's what the credentialing committee was working on. They were asked, but about privileges, they recommended them. That's it. They didn't go any further. The suggestion here is what they did caused there to be some change of position or something further to be done by the MEC, and it wasn't true. Okay. Let's clarify, because a lot of this is new procedure for those of us in the law particularly. But we have the study. We have the empirical evidence. Okay. Comparison group is internal to the department. Who is it, or what committee, and who are they composed of, that made the, quote, recommendation of remedial efforts to be undertaken by Dr. Trena? That was done by one of the department heads, I believe, and then Dr. Miller, who is the gentleman who is the head of the entire department, the entire OSF. So the three individuals, three positions at issue here, were not involved in that recommendation? That's correct. And what you're talking about... Did they serve on the hearing committee? No. You know, there was an objection made before the hearing by three people. That objection was overruled. It was. And then there was the objection. It was overruled. They were allowed to stay on the hearing committee. In fact, Shackleton was the chairperson of the hearing committee. Right? One of the doctors was the chairperson. And so the difference you're suggesting is the ultimate vote. No, I think what I'm suggesting, Your Honor, is that the credentialing committee of which Shackleton was a member and that whole decision that was done by the credentialing committee to just continue his privileges was both not good. It was outside the whole scheme of corrective action and adverse recommendation. He didn't make any decision about an adverse recommendation. Adverse recommendations are done by the board in one, and MEC in particular. And the ad hoc committee is the one who recommends that it be done. In this case, the initial letter going to Dr. Trena was to simply advise him of the circumstances of what happened and to say this is what we recommend. It wasn't at that time a corrective action. I have a question. Who are the we? This is what we recommend. Who made up the we? The orthopedic department, after reviewing all of this, had a recommendation, but it wasn't an adverse recommendation as found in 15.8. It was a suggestion of how to resolve the problem. Corrective action is only encountered and started with the ad hoc committee, which wasn't another year and a half later. You know, I'm going back to 15.8. 15.8 doesn't talk about the ultimate decision or decision. It prohibits anybody from serving on that committee that had investigated or initiated the investigation into the underlying conduct or who actively participated in formulating the adverse recommendation. That's much broader than deciding the adverse recommendation. When we talk about formulating the adverse recommendation... The adverse recommendation or action is something we're talking about participating... Absolutely correct. In other words, when this says, a hearing committee shall have no members who have actively participated in formulating the adverse recommendation, none of them did. None of them... That adverse recommendation came from the MEC? Correct. They're the only ones... And who's on the MEC? Any one of the three individuals? None of them. Okay. That is very critical to our whole approach here. But they were on the other committee that studied all the doctors, right? One of them was on the committee from the beginning who looked at a number of statistics. It wasn't focused on Dr. Trena at all. I know it wasn't focused, but at the end of that investigation, they focused on two people. One was Trena. That's correct. And so the question is, and this is why we're saying, that that is not a point at which it says, initiate or investigate the underlying matter at issue at an earlier stage of the proceedings. To us, proceedings is when you need to take action with the ad hoc committee who then investigates. We're not talking about the committee at the very beginning, the QA people, the orthopedic department, being that particular committee. We're talking about ad hoc committee beginning the proceedings. And ad hoc is the MEC? Ad hoc, actually, Your Honor, it's a separate group that is charged with investigating the circumstances. And from the ad hoc committee, it goes to the MEC for decision making. Okay. So the ad hoc committee, no membership on the ad hoc committee by any of the three. No, no, they're on the ad hoc committee, aren't they? No. Aren't the three people, they're on the preliminary committee that studied all the process, right? Yes, sir. No. Okay. So I want to be clear, so we're clear. The ad hoc committee, none of the three individuals are involved. That's correct. And then the ad hoc then makes a recommendation to the MEC? Correct. And the MEC then makes a formalized remedial requirement? Exactly. And that's what led to Dr. Trena exercising his rights that he has for a full-blown hearing, and that's what we have. But in between that process, Dr. Trena goes to the credentialing committee, and the credentialing committee says, we're not going to make a decision whether to re-credential you again. We're going to table it pending the outcome of that hearing on the first and first ruling. And then the two people that table the discussion about whether he should be credentialed are serving on the committee reviewing the first adverse ruling. So haven't they injected themselves into that investigation and process? No. I don't think so, Your Honor, because at that point, first of all, they don't take any vote, and they had nothing to do with the actual vote. They were not present, and no one has said to the contrary. But more important to this, on the credentialing committee, they did not. Didn't they vote to table it? They took no vote, Your Honor. Both Shackleton and Curtis weren't even at the meeting. To table. Correct. And as far as tabling, maybe we have what our suggestion is and what I believe occurred and what did occur is that they said, you can go ahead with the core privileges that you wanted, but we're taking no action with respect to anything else pending approval of somebody else. They're taking no position at all. Their only role here, their only role is not to investigate or do anything further. The only role is to determine whether those privileges should be allowed that are being requested, and they said they could. The core privileges were allowed. Later, after the hearing. No. No. Tell me again. The core privileges were allowed. Core privileges were allowed, as they were throughout this entire process. When was he credentialed? That's what happened before the credentialing meeting occurred. He asked for credentials in August or September. Three months later, the credentialing meeting committee met. These two gentlemen were not present, and they simply said, go ahead. We'll keep the status quo. You can have the status, you can have your core privileges, but we're not going to be addressing the other until another party because it's not their job. So all they did was pass the thing along. The truth is. And then serve on the committee that they were waiting for the decision. They had nothing to do with the vote. I understand your position. I understand, and I don't mean to. No, I understand your position. It's a frustrating bit of facts. And I'm sure it's frustrating to you because in hindsight, oh gosh, it would have been so much nicer. I'm trying to get this. Maybe I misspoke about the committee, but as I understood it, Smith was a member of the plaintiff's department where the underlying study had originated, correct? Okay. And he had attended various department meetings in which the underlying study revision and the situation of the plaintiff was discussed, correct? He was, along with all the other doctors. Right, but he was there. He was there. And Curtis was the vice chairperson of the credentialing committee. Correct. That had denied the request for renewal privileges and was present at two of the credentialing committee prior meetings in August and September of 08, correct? He was present for those two meetings in which there was no decision made regarding Dr. Tremblay. And there was a discussion of the plaintiff's request for renewal that was discussed, although the only information that was available at the meetings, there weren't formal minutes, and of course this is at the pleading stage, correct? Correct. Shackleton was a member of the credentialing committee and was also present at the two prior meetings when the request for renewal was discussed, correct? Yes, correct, when it was positioned to the committee. Now, it is true that Curtis and Shackleton, neither of them were present at the credentialing committee meeting when the actual vote took place. That's correct. And that's what you're pointing out. That and the fact that the credentialing committee formally has nothing to do with that, its recommendations and actions. If the members hadn't then gone to the next committee. Weren't they in effect voting on both things? The outcome of that hearing was going to decide whether he would get re-credentialed. Maybe it's just a matter of nomenclature, and I have no interest in arguing one bit here. All I'm trying to say is the credentialing committee is outside the process that's being followed here. It's a committee. It's not investigating anything. And I interrupted Justice Aldrich. You've clarified it for me. And I apologize. I don't mean to argue with you, but this is our only opportunity to ask you questions and probe these issues and facts that are somewhat convoluted and a little confusing. So we take advantage of your time and intellect. I appreciate that. Any other questions? Counsel? We'd ask for any comments of the court's decision. You may approach. And again, I don't mean to be abrasive or argumentative in the questions I address. I'm energized by the quality of the discussion that the lawyers bring into this courtroom, but please don't feel like I intend to argue or debate. With that apology, you may proceed. No apologies necessary. I understand your role and certainly appreciate the time and effort you have put into preparing for this case. There were some things that started out in the argument that caught my attention that I wanted to bring up. We're talking about a de novo review, but it's important that we understand how we got here. How we got here, the decision on the verified amended complaint by Judge Lyons says a few interesting things. It says, and counsel used a different word, but it has the same meaning. Judge Lyons said there was no showing made by the plaintiff. On the 2615, on the 2619, counsel said there was a finding that they followed the bylaws. There's no finding here. We're talking about a 2615, 2619 motion which looks at the allegations made by the plaintiff. We are doing this de novo. Yes, yes, you are. I think that's the one thing we all agree on. With respect to the committees in 15.8 and count one, there are two adverse actions. Counsel suggests that the credential committee is something separate and it's already going on, the hearing's going on, you can sort of discount them, but you can't because of the language of 15.8. It talks about the adverse recommendations at issue in the proceeding, and by the board of the hospital's own admission in the appeal at the hospital level. There are two. There is one that results from the study by the Department of Orthopedics through the ad hoc to the adverse recommendation about privileges with respect to that study. There is a second one. It goes from the requirement that he reapply for privileges, which he does, and the credential committee's decision to grant privileges except for two, and they're holding those. And the bylaws say that if the credentialing committee, which makes the recommendation to the MEC and that MEC decision, is adverse to the practitioner in any way, they have hearing rights. And Dr. Train has notified that he has, as a result of the MEC's decision about the privileges, which is based on the recommendation of the credentialing committee, that he has hearing rights with respect to that. Those two actions are consolidated into this one hearing. What counsel seems to be saying is, we have the first one. The credentialing committee is just sort of a follow-on. It really isn't in the same path, and they're already at hearing. But if that's right, then they can get around 15.8. They can take an adverse action. The hospital could. And then there could be subsequent adverse actions on the same facts and involve all these doctors in the hospital, and they can all hear all the committee discussion without the practitioner present, and then they can serve on the hearing committee. Let me, with regard to the process, because your opponent is arguing that the process is this more limited process. You're arguing that includes everything. Right, yes. So you're saying it's the whole box. They're saying it's just a box within the box. And that process has not been, it does not have any 15.8 taint with regard to the three. And the hearing committee consisted of the three doctors objected to. Yes. Now, 15.8 talks about anyone who investigated the underlying conduct. And investigating, it just says that, investigation, investigation. Did the credentialing committee look at the underlying conduct? What we know from the minutes, which is all we have at this point, is that the application was made. The credentialing committee discussed Dr. Traynham. That's in the minutes. They discussed his application. Beyond that, it's unclear what they discussed. The minutes aren't verbatim transcripts. But I would submit that at this stage of the proceedings, the inference in our favor is that they did discuss what had gone on. They did discuss what he was reapplying for. They did discuss why to grant or not grant certain privileges. Now, Smith was on the member of the plaintiff's department that took the underlying study, which looked at everybody, and then keyed in on two people, correct? Correct. Smith was part of that department. Yes. And then Curtis was the vice chairperson of the credentialing committee. And Shackleton was a member of the credentialing committee. And they were also looking at the underlying conduct. Is that correct? Again... I mean, the allegation is... The allegation is that they investigated the matter, to use the 15-point, the matter at issue. There are two matters at issue here. There's the credentialing committee decision... Because there was a request to renew privileges. Right, which is required. He has to reapply, as I mentioned to Justice Holbrook. And what I'm talking about... I'm talking about the allegations in your complaint, in your amended complaint. Yes. You allege that in your amended complaint. We allege that he reapplied, that they were there at these meetings and participated in those meetings where he was discussed. Yes. I understand counsel's point that the proceedings had not begun when Smith was involved in the discussion of the investigation, leading to the conclusion that there were two outliers and your client was one of them. And in my feeble brain, I have come to the conclusion it doesn't matter whether all three doctors should have been excluded or one. So can you address why the proceeding began when Curtis and the name I can't pronounce... Shackleton. Shackleton tabled the decision of the credentialing committee? Sure. And I'd like to clarify one point before I answer if I can. They didn't table the discussion. They made a decision that was forwarded to the MNC that the MNC adopted, which is that he would get his privileges except for certain ones. So the decision... There was a decision. And these two physicians did not vote on the decision to minimize or amputate some of the privileges that had been previously granted. Correct. They were not present for the vote. Okay. So tell me why that makes it part of the process. Sure. Because we're talking about the proceeding regarding the matter at issue, or in this case, matters at issue. This is why I started out my argument by noting there are two adverse actions and we need to look at it as two adverse recommendations. We need to look at it that way because the hearing is determining the propriety of those two adverse recommendations, one from the department and one that came through the credentialing committee. And actually, counsel's argument supports the finding that the credentialing committee is part of the proceeding. Counsel seems to suggest that the ad hoc committee was part of the proceeding. I think in response to one of Justice Holbridge's questions, he talked about the ad hoc committee is where the process starts and they make a recommendation to the MEC. So if that's part of the process, the credentialing committee is too because they're in the same position. They're taking in a credentialing and they're making a recommendation to the MEC. And the bylaws in the section about credentialing... Who's making the recommendation to the MEC? The credentialing committee. Okay. MEC is a nice acronym, but... Medical Executive Committee. Okay. The head of the hospital. Okay. The whole thing says he wants 100% of his privileges. He wants to operate and continue on. He's got core privileges to be in the hospital and the practice except for certain types of procedures. Is that correct? Correct. Okay. And who's the final person who says, or committee, that says you can get full or you get partial privileges? Is it the credentialing committee or is it the MEC? Ultimately, at that level, ultimately the MEC must adopt or stamp or change or reject the credentialing committee's decision. Okay. So it's the MEC at this point. Ultimately, yes. They're the ones that ultimately impose it, but they take the recommendation from the credentialing committee. And in the bylaws, that's part of the process. The bylaws even show that an adverse action on a credentialing recommendation takes you to Section 15 hearing process. So it's part of the bylaw hearing, I don't want to say process, but it's part of that path, if you will. Thank you very much. Are there any other questions? Thank you. Thank you for your consideration. Both attorneys did a marvelous job of dealing with us and providing us with the information we require before taking the matter under advisement, conferring with each other. And I would like to say we're going to render a decision without undue delay, but there's a lot to discuss in this case, and we'll do our best to do it swiftly. Thank you.